**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 20-cv-1497

KERI LEIGH SALAZAR; and S.S., by her parents and next friends, Keri Leigh Salazar and Matthew Salazar

      Plaintiffs,

v.

CITY OF BOULDER, COLORADO, a municipality; OFFICER ED QUAYLE, in his individual capacity; and OFFICER SHANE RODGERS, in his individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff Keri Leigh Salazar and Plaintiff S.S.[1], by her parents and next friends Keri and Matthew Salazar, through their counsel Hutchinson, Black and Cook, LLC, file this Complaint and Jury Demand and aver as follows:

**INTRODUCTION**

      1.    This is a civil rights complaint arising from the Boulder Police Department's violent arrest of a mother, while holding her almost-five-year-old daughter, when the mother lawfully exercised her right to decline to interview with a police officer. Rather than respect this citizen's lawful right to refuse to be interviewed by the officer without legal counsel present, the Boulder Police officers first threatened Ms. Salazar for refusing to talk with them, and then when she began recording their conduct on her phone, violently assaulted and arrested her, thrusting

---

[1] Because Plaintiff S.S. is a minor child, she is referred to herein through the pseudonym "S.S." rather than by her legal name.

both mother and young daughter against a parked vehicle before ripping S.S. from Ms. Salazar's arms and traumatizing both of them.

2.      After Ms. Salazar's arrest, the police were caught on body-cam video scrambling to make up an explanation to justify the arrest.  Such after-the-fact strategizing lays bare the reality that the Boulder police continue to make violent, unlawful arrests without probable cause when citizens exercise their First Amendment rights, and then try to come up with pretexts to justify this outrageous and illegal conduct.  Only by standing up for their civil rights can citizens like Ms. Salazar and S.S. hold the City of Boulder and its officers accountable for this conduct.

3.      Indeed, this case is one of multiple incidents that exposes an alarming pattern and practice by the City of Boulder's police force of disregarding the U.S. Constitution and failing to take obvious steps to deescalate citizen encounters when an officer feels his authority is being questioned.  In America, exercising one's rights is legal, and it is time for the City of Boulder to require that its officers show the resilience to do their jobs in a safer and more decent manner.

## PARTIES

4.      Plaintiff Keri Leigh Salazar lives in Highlands Ranch, Colorado and is a citizen of the State of Colorado.  Plaintiff Salazar suffers from left temporal lobe epilepsy, cyclic vomiting syndrome, and has a disability diagnosis in light of these diseases.  She has been on SSI since 2013.  When Ms. Salazar has seizures, symptoms include intense confusion, nausea, and vomiting, sometimes followed by grand mal seizures where Ms. Salazar loses consciousness.

5.      Plaintiff S.S. is a minor child of Keri and Matthew Salazar.  At the time of her mother's arrest, S.S. was almost five years old.  Plaintiff S.S. lives with her parents, Keri and Matthew Salazar, at the family's home in Highlands Ranch, Colorado.  Ms. Salazar and Mr. Salazar are bringing claims on S.S.'s behalf in their roles as her next friends.

6. Defendant City of Boulder, Colorado ("Boulder") is a home-rule municipality in Boulder County, Colorado.

7. Defendant Officer Ed Quayle is a police officer who at all times with respect to the conduct alleged herein was acting under color of state law as a police officer with the Boulder Police Department ("BPD").

8. Defendant Officer Shane Rodgers is a police officer who at all times with respect to the conduct alleged herein was acting under color of state law as a police officer with the BPD.

## JURISDICTION AND VENUE

9. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

10. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State of Colorado at the time of the events giving rise to this Complaint.

## FACTUAL ALLEGATIONS

11. The events described below arise from a police encounter with Plaintiff Salazar and her then almost-five-year-old daughter, Plaintiff S.S., beginning at approximately 6:00 p.m. on the evening of June 20, 2019 in downtown Boulder, Colorado.

### a. The Boulder Police Receive a Report Concerning an Upset Store Patron.

12. During the late afternoon of June 20, 2019, the BPD responded to a 911 call from a clerk at the store "Jackalope" on the Pearl Street Mall. The caller reported that two women had had an argument, and one of them had locked herself in a back room.

13.     BPD arrived at the scene and found an acquaintance of Ms. Salazar's named Annie Moore in the back room. Ms. Moore is a largely estranged cousin of Ms. Salazar's who was driving across country and while in Colorado, stopped in to visit Ms. Salazar.

14.     When BPD encountered Ms. Moore, she was in a confused and scared state.  She contended she locked herself in the back room after an argument with Ms. Salazar.  Ms. Salazar was not at that location, and Ms. Moore did not know where Ms. Salazar was.

15.     While being recorded on bodycam video, Ms. Moore narrated her dispute with Ms. Salazar.  She explained that she, Ms. Salazar, and S.S. had driven to Boulder in Ms. Salazar's Ford F-150.  They had had lunch several hours earlier, including drinks over lunch, according to Ms. Moore.  Ms. Moore said she took Ms. Salazar's keys to prevent Ms. Salazar from driving.

16.     During the course of her narration of events, Ms. Moore contended that Ms. Salazar had said S.S. was locked in the vehicle, and was demanding that Ms. Moore return the keys so that Ms. Salazar could get S.S. out of the vehicle.

17.     Ms. Moore told BPD that she responded by refusing to turn over the keys to Ms. Salazar. She then showed the keys to BPD as proof.

18.     Throughout this brief interview, Ms. Moore seemed confused and could not even recollect where the Ford F-150 was located, although she had ridden to Boulder in the vehicle with Ms. Salazar and S.S.

**b.  Ms. Moore Leads BPD on a Search for Where the Vehicle Was Left.**

19.     BPD began walking around the neighborhood with Ms. Moore in what appears to have been a welfare check to see if they could locate the vehicle, and see if a child was locked inside.

20.     After about fifteen minutes of searching in multiple directions, during which Ms. Moore seemed unable to recall basic details of the afternoon, the walkabout was successful, and Ms. Moore recognized the Ford F-150 as being parked in on-street angle parking on Spruce Street in downtown Boulder between 13th Street and 14th Street.

### c.  BPD Confronts Ms. Salazar and S.S. at Ms. Salazar's Vehicle.

21.     When BPD arrived at the location of the vehicle, young S.S. was seated on her mother's lap in the driver's seat and the door to the vehicle was open.

22.     By all appearances in the bodycam video footage, when the police got to the vehicle, S.S. was not in any noticeable harm or distress.

23.     This, of course, resolved and disproved what Ms. Moore had told BPD – that S.S. was locked in a vehicle.  It therefore resolved the report from Ms. Moore that a child may be locked in a vehicle unattended.

24.     BPD asked Ms. Salazar and S.S. if they were ok.  Ms. Salazar, who was on her phone at the time, said they were "fine," and S.S. added "except Annie [Moore] took our keys."

25.     BPD Officers Rodgers and Quayle surrounded the driver's door with Officer Rodgers closest to the curb. When in this position, egress from the area immediately outside the driver's side door was blocked by the two officers on either side of the door, and a vehicle parked in the parking spot to the left of the F-150.

26.     After being told that Ms. Salazar and her daughter were fine, Officer Quayle requested Ms. Salazar exit the vehicle to speak "in private."   Ms. Salazar responded by asking to know why Officer Quayle was requesting she get out of the vehicle to talk.  Officer Quayle answered that he believed she was intoxicated and behind the wheel of a vehicle.

27.     At this point, Ms. Salazar stated the obvious -- she did not have any keys, which is precisely what the reporting party, Ms. Moore, had told BPD.  Thus, there was no plausible basis to contend Ms. Salazar could be driving while intoxicated or have actual physical control of the vehicle.

28.     Moreover, Ms. Salazar was not, in fact, intoxicated at the time, although it does appear she was in the beginning stages of having a seizure.  Though some symptoms of seizure could be confused for intoxication, at no time during the entirety of the police contact did BPD request any field sobriety tests, preliminary breath test, or otherwise seek to determine whether Ms. Salazar was intoxicated.

29.     Ms. Salazar's refusal to leave S.S. unattended and have a "private" conversation with Officer Quayle enraged him.  He continued by repeatedly requesting that Ms. Salazar exit the vehicle and come talk to him in private and increasing the demanding tone in his voice.

30.     The following is dialogue between Officer Quayle and Ms. Salazar during this encounter:

Quayle [directed at S.S.]:      Do you mind if I talk with your mom a minute?
Salazar:      We're fine.
Quayle:      OK, I need to talk with you.
Salazar:      We're fine.
…
Quayle:      Let me rephrase this, I need to speak with you directly.
Salazar:      We're fine.
…
Quayle:      That's not going to cut it.  I need to speak with you out here directly.
Salazar:      I understand that.  Unless my lawyer is with me, I am not speaking to you.
Quayle:      OK, well then that's going to go very bad for you tonight.

31.     Given that the time was approximately 6:00 p.m. on the evening of June 19 with sunset still two-and-a-half hours off, the threat that this is "going to go very bad for you tonight" could only be reasonably interpreted as Officer Quayle threatening to jail Ms. Salazar if she would not consent to his request for a "private" interview.

32.     At this point, Ms. Salazar's phone rang, and she answered and explained to the caller, her mother-in-law, that the police were there and she should call Ms. Salazar's husband.

33.     During the conversation, Officer Quayle said that he would like to speak with the caller directly.  A few seconds later, Ms. Salazar complied, began stepping out of the vehicle, and handed the phone to Officer Quayle.

34.     Notwithstanding his previous instruction for Ms. Salazar to speak with him outside of the vehicle, Officer Quayle pushed Ms. Salazar back onto the driver's seat and said the following, while now visibly angry and agitated:  "Ok, I'm going to need to tell you something right now.  You're going to end up in cuffs in a few seconds if you don't start cooperating with me.  Do you understand me?"

35.     Officer Quayle continued, increasingly frustrated, trying to get Ms. Salazar to follow his orders, while pointing at Ms. Salazar and S.S.  Officer Quayle's harsh tone caused S.S. to declare:  "I'm scared."

36.     Officer Quayle was by now repeatedly interrupting Ms. Salazar and escalating the situation for no public safety purpose.

37.     Ms. Salazar responded by asking "what did I do," and was told, only, "I need to speak with you in private."   Officer Quayle never provided any lawful reason why Ms. Salazar was being asked to leave her child in the vehicle and go speak with him in private.

38.     Officer Quayle finally addressed Ms. Salazar's mother-in-law, who was on the phone.  The mother-in-law attempted to diffuse the situation, saying she would come retrieve Ms. Salazar and S.S.  Officer Quayle responded:  "that will be outstanding," and asked the mother-in-law to come and pick them up.

39.     But Officer Quayle, letting his temper get the best of him over the indignity of not being able to control this citizen's decision whether to speak with him, immediately let the opportunity to resolve this contact with Ms. Salazar pass.  Shortly after the call, he asked Ms. Salazar for identification. Ms. Salazar responded "why," and then began recording the encounter on her phone.

40.     Ms. Salazar's decision to record Officer Quayle's behavior greatly increased his frustration.  Several bystanders were now stopped and monitoring the interaction.

41.     Officer Quayle said he was demanding identification because Ms. Salazar was "attempting to leave," a contention that was absurd.  The bodycam video makes clear that Ms. Salazar is a petite woman who was boxed in between two large vehicles and two large police officers.

42.     In any event, Ms. Salazar responded by pointing out to Officer Quayle what he already knew, that Ms. Salazar, while seated in her vehicle, door open and with her child on her lap, could not be attempting to leave, because she had no keys to the vehicle.

**d.  Officers Quayle and Rodgers Violently Arrest Ms. Salazar and Injure S.S.**

43.     A bystander witnessing the harassment of Ms. Salazar and S.S. intervened by handing Ms. Salazar a cup of water and also recording the interaction on his phone.

44.     Ms. Salazar then leaned out of her vehicle to speak with the bystander and encourage him to continue observing the situation so that she would have a witness to the

harassment she was experiencing.  While doing so, she was recording the bystander on her cell phone.

45.    Officer Quayle was determined to stop the filming of this encounter.

46.    When Ms. Salazar, holding S.S. in her arm, got one foot down on the pavement to facilitate her filming of the bystander, Officer Quayle, assisted by Officer Rodgers, grabbed Ms. Salazar and threw her and S.S. onto a vehicle next to the Ford F-150. As the two were slammed against the vehicle, S.S. took the brunt of the face-first impact having been being held in her mother's arms.   The officers forcibly pulled an injured and now-terrified S.S. from her mother, while placing handcuffs on Ms. Salazar.

47.    In the process, the police caused a cut and bruising on S.S.'s ear along with the physical pain of her hitting the car parked to the left of Ms. Salazar's vehicle.

48.    Officers Quayle and Rodgers then forcefully continued their arrest of Ms. Salazar, with Officer Rodgers pushing her into the back of a patrol car.

49.    All the while, S.S. was screaming out hysterically at being separated from her mother and seeing her mother being violently arrested.

50.    While being arrested, Ms. Salazar repeatedly cried out in pain after being locked in overly-tight handcuffs behind her back in a position that caused injury to Ms. Salazar's wrists and back.  Officers Quayle and Rodgers repeatedly dismissed Ms. Salazar's pleas for help, and would not handcuff her in a different position that would have avoided causing back injury.

51.    Officer Rodgers explained to Ms. Salazar that, upon handcuffing her and placing her in the back of the patrol car, she had been "arrested" and taken into custody.

52.     Officer Rodgers stated to Ms. Salazar shortly after locking her in the vehicle: "I'm not going to talk to you anymore until I Mirandize you.  But for now you're being detained until we can figure out what's going on."

### e.  BPD Officers Conspire To Try To Find an After-the-Fact Justification for the Arrest.

53.     As is made clear by the bodycam video, Ms. Salazar was arrested because Officer Quayle could not handle someone who wouldn't follow his orders.  However, knowing that Officer Quayle's arrest was illegal, the BPD officers on scene began scrambling to come up with a theory to justify the arrest.

54.     Upon being placed in the police car, handcuffed with her arms behind her back, Ms. Salazar asked the basis of her arrest.  Officer Rodgers gave his first of what would turn out to be multiple and inconsistent justifications.

55.     Officer Rodgers explained to Ms. Salazar, nonsensically, that although the door of the F-150 was open and Ms. Salazar had no keys, "without the keys you're still in control of that vehicle," suggesting she had been arrested for driving under the influence.

56.     This first theory to explain the arrest, however, was quickly abandoned, presumably because there was no evidence to support it.

57.     A few minutes later, Ms. Salazar asked again: "what am I under arrest for," and this time was told by Officer Quayle:  "for the investigation of a possible third degree assault."  That, too, would soon change, because there was no probable cause for an assault arrest.  No one had even claimed to have been assaulted.  It was only the second of multiple theories BPD would gin up as a pretext for the arrest, only to abandon the theory because the facts, caught on bodycam video, could not support it.

58.     Officer Rodgers was also unsure of how to justify the arrest.  He stated on his bodycam video: "right now we're still trying to figure out everything.  We basically ask the mom to calm down.  She gets out of the car with the kid.  So we put her in handcuffs, I take the kid away from her to give her to the lady [Ms. Moore].  That's who we originally contacted at Jackalope, and she's going to be listed as the victim."

59.     But the messaging from the officers changed further.  As several bystanders were visibly concerned and at least one additional person was filming the encounter, Officer Quayle gratuitously stated to one of the bystanders: "We came up here for an entirely different situation.  However, we're concerned about the safety of that child.  As you can see, things escalated pretty quickly.  It's ridiculous, but we're trying to make sure she didn't drive off intoxicated."

60.     Officer Quayle was back to telling people that this somehow related to DUI despite the fact that Ms. Salazar had no keys and BPD had made no effort to determine any level of intoxication.

61.     At this point, it was painfully obvious to the officers that they had no lawful basis for their arrest of Ms. Salazar who was sitting in handcuffs and crying in their police vehicle.  In the ensuing minutes, Officer Quayle continued trying to determine a satisfactory reason to justify the arrest he had already effected.

62.     He narrated to himself yet another possible basis for arrest to a fellow officer, knowing he was being recorded on his bodycam.  He explained:  "She's absolutely refusing to comply with us in any way. … She jumps out of the car, carrying the daughter, and we just grabbed her before she took off running with the kid in her hands."

63.     This third excuse for the arrest could not be squared with the bodycam video footage.  Ms. Salazar was not attempting to run anywhere.  Thus, BPD ultimately abandoned this third excuse for the arrest as well.

64.     Officer Quayle then made up yet another new story to try to justify the arrest – he said to a fellow officer that Ms. Salazar "left her daughter locked in this freakin' car while they all went out to lunch."

65.     This fourth theory was bereft of any evidence at all.  Not one witness ever suggested S.S. was left in a vehicle while Ms. Salazar and Ms. Moore went out to lunch.

66.     Officer Quayle continued on the bodycam by acknowledging that he didn't really have a basis for this new theory, saying "so I need to get more details for that part, but she was completely noncompliant" with his requests for an interview.   Officer Quayle's overall summary is that this was "something entirely minor that escalated, so not very big."

67.     Shortly thereafter, and by now well after Ms. Salazar's arrest, Officer Quayle interviewed Ms. Moore again, with his bodycam on.  He asked Ms. Moore how long she thought S.S. might have been left in the car.  Ms. Moore speculated that it was "15 - 20 minutes," although by her own account when first interviewed by the police she had no actual knowledge that S.S. had ever been in the vehicle alone.  At this point, Ms. Moore also admitted what was obvious from the fact that she had retained the keys the entire time – S.S. could not have been locked in the vehicle.  Likewise, Ms. Moore made clear to BPD that S.S. was not, in fact, left in the car while Ms. Moore and Ms. Salazar had lunch.

68.     Officer Quayle next proceeded to call Ms. Salazar's husband, who was by then en-route to Boulder.  This call, too, is captured on the bodycam video.  To Mr. Salazar, Officer Quayle gave yet another explanation for his arrest of Ms. Salazar.  This time, he said: "basically we came

up here to talk with your wife.  She was intoxicated and quite frankly rather combative with us.  It didn't go well I gotta tell ya, and we ended up taking her into custody because she jumped out of the car with your daughter."

69.     On information and belief, this fifth attempted rationale – that Ms. Salazar was intoxicated and had been "combative" with a police officer, ultimately was not used as the basis for the arrest because, as the bodycam video makes clear, Ms. Salazar never "combat[ted]" anyone.

70.     In any event, Mr. Salazar followed up by asking what BPD was planning to do with his wife, to which Officer Quayle said: "At this point, because of your wife's lack of cooperation, because she … I don't think she's safe.  She was completely uncooperative with us …."

71.     During the call with Mr. Salazar, Officer Quayle was informed that Ms. Salazar "had recently been diagnosed with a seizure disorder that affects her behavior and causes aggression."  Mr. Salazar further explained that the seizure disorder was a "temporal lobe" seizure disorder that caused Ms. Salazar "to fall … and display features consistent with tonic-clonic."  Officer Quayle explained he understood the nature of that seizure disorder.

72.     In this interaction with Mr. Salazar, Officer Quayle admitted the true reason for the arrest – Ms. Salazar had been arrested because she was uncooperative with a request for a voluntary interview, "in private."

73.     As Ms. Salazar sat in the back of the patrol vehicle, Officer Quayle is seen on the bodycam video huddling with fellow officers to try yet again to come up with legitimate charges to justify the arrest.

74.     During this discussion, Officer Quayle first tried unsuccessfully to turn his bodycam off, but after fumbling with it he says: "isn't muting, so just a heads up," at which point the other officer said "just turn it off."

75.     The camera remained on, however, and captured the other officer asking what to charge, to which Officer Quayle now proposed: "first off child abuse – mom was falling down drunk, she took a tumble."   At this time, Officer Quayle knew that Ms. Salazar had a seizure disorder, and that Ms. Moore's report of Ms. Salazar falling earlier in the day was consistent with a symptom of a seizure.

76.     Indeed, BPD made no effort to ascertain any level of intoxication either before or after her arrest, and had no basis to charge Ms. Salazar with child abuse based on alleged intoxication.

77.      After further discussion, they landed on the theory that they finally included in the arrest report – that S.S. allegedly was left in the vehicle unattended for 15-20 minutes.  As they put it during their huddle to develop the theory, "doors were locked, well we don't know if the doors were locked for sure."

78.     Though Ms. Salazar clearly disputes that allegation, in any event, at the time of the arrest BPD had nothing but Ms. Moore's contention that she had been told by Ms. Salazar that S.S. was locked in the car, despite the fact that the keys were in Ms. Moore's very hand, and when they arrived at the vehicle, the police knew that Ms. Moore's report was incorrect.

**f.   BPD Takes Ms. Salazar to Boulder Community Hospital.**

79.     In light of Ms. Salazar's continued complaints about the stress position she had been put in when locked in the police vehicle with her wrists tightly handcuffed behind her back and the abrasions to Ms. Salazar's knee, Officer Rodgers decided to have Ms. Salazar's back pain and knee abrasion examined by Boulder Community Hospital ("BCH") before transporting her to the Boulder County Jail.

80.    Ms. Salazar's complaints about the extreme pain her handcuffing was causing to her wrists and back continued throughout her time at BCH.  BPD refused to change the positioning of the handcuffs to reduce Ms. Salazar's wrist and back pain.

81.    At BCH, the officers lied to the medical personnel examining Ms. Salazar about Ms. Salazar's condition.  Knowing full well that she had a seizure disorder and that her husband reported that Ms. Salazar appeared to be in the throes of a seizure, the police instead informed BCH that Ms. Salazar was "under arrest for leaving her child in locked car while she went inside to drink alcohol over lunch."

82.    Although BPD had spoken repeatedly with Ms. Moore, Ms. Salazar, and Ms. Salazar's daughter S.S., not one witness had ever said Ms. Salazar had left S.S. in a vehicle to go to lunch or to drink alcohol, whether for an extended period or otherwise. This was simply a false statement to justify an unlawful, retaliatory arrest, given to medical providers, which interfered with Ms. Salazar being properly treated at the hospital for the seizure she was experiencing.

**g.    Ms. Salazar Is Jailed Without Legal Basis, Exacerbating Her Underlying Physical Disabilities.**

83.    After being discharged from BCH, Ms. Salazar was taken to the Boulder County Jail for booking.

84.    While at the Boulder County Jail, Ms. Salazar received no treatment, and her seizure progressed into a grand mal seizure while she was at the jail.  Ms. Salazar was released from the jail the next day.

**h.    The Bogus Charge Against Ms. Salazar Is Dismissed.**

85.    BPD ultimately cited Ms. Salazar with knowing or reckless child abuse with no injury in violation of C.R.S. § 18-6-401(7)(b)(I), using as a justification BPD's post-arrest

interview of S.S., where S.S. contended she was left in the vehicle for approximately ten minutes while her mother attempted to retrieve her keys that Annie had snatched away.

86.     As is explained above, BPD did not develop the evidence for its theory of probable cause until after Officer Quayle had already arrested Ms. Salazar.

87.     Approximately seven weeks after the charges were filed, the District Attorney's office filed a motion to dismiss the charge, based on their "further review of the facts associated with the … case pending against" Ms. Salazar.

88.     The County Court for Boulder County granted the motion the next day.

**i.     BPD's Conduct Has Caused Damage and Injury to Ms. Salazar and S.S.**

89.     Defendants' acts and omissions caused Ms. Salazar and S.S. damages in that they suffered physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, and sense of security and individual dignity, among other injuries, damages, and losses described below.

90.     Both Ms. Salazar and S.S. experienced intense pain when slammed against a car while being arrested by Officers Quayle and Rodgers.

91.     At the time of Ms. Salazar's arrest, in the words of arresting officer Qyayle, S.S. "was screaming due to trauma" caused by the violent arrest.

92.     With respect to the improper handcuffing, Ms. Salazar suffered injuries including bruising of Ms. Salazar's wrists, as well as a back injury.

93.     This incident has also caused profound emotional distress for both Ms. Salazar and S.S.  Ms. Salazar is suffering symptoms of PTSD from this mistreatment, and goes to counseling weekly.  Likewise, because of this wrongful arrest for child abuse, Ms. Salazar is prohibited from volunteering at her daughter's school, and is otherwise suffering from the social stigma of the arrest.

94.     As for S.S., she, too, is exhibiting signs of trauma from the incident.  She has experienced emotional regression and repeatedly expresses fear arising from the incident.  As just one example, when a police officer visited her school for an unrelated reason, S.S. returned home that day terrified.  She routinely points out police to tell her parents to avoid them at all costs.

### j.   The BPD's Conduct Was Part of the City of Boulder's Policy and Custom of Disregarding the Rights of Citizens During Police Encounters.

95.     The City of Boulder has a widespread practice amounting to a custom and policy of unlawfully arresting and applying excessive force to persons for questioning the directions of police officers, refusing to comply with voluntary interview requests, recording officers' conduct, and otherwise exercising their First Amendment Rights.

96.     The City of Boulder has failed adequately to train its police officers in the appropriate way to respond to persons who question the directions of police officers, refuse to comply with voluntary interview requests, record officers' conduct, and otherwise exercise their First Amendment Rights, including but not limited to by training BPD officers in appropriate ways to deescalate conflict.

97.     The City of Boulder's policies, customs, and practices in failing to properly train and supervise its employees are a proximate cause of the violations of Plaintiffs' constitutional rights alleged in this Complaint.

98.     The City of Boulder ratified the actions of Officer Rodgers and Officer Quayle by taking no action in response to a citizen complaint by Ms. Salazar's husband, Matthew Salazar, concerning the mistreatment of his wife and daughter.

99.     The City of Boulder has been put on notice multiple times in the last several years of its illegal policy and custom of unlawfully arresting and applying excessive force to persons for questioning the directions of police officers, refusing to comply with voluntary interview requests,

recording officers' conduct, and otherwise exercising their First Amendment Rights. It remains deliberately indifferent to its police officers' routine violation of persons' First and Fourth Amendment rights as described in this Complaint.

100. As just a few examples of this conduct, the City of Boulder has been notified that on July 15, 2018, Kelly Clark was waiting to get food near 1155 13th Street in Boulder, Colorado, when she became concerned that the BPD was using excessive force on another individual they were in the process of arresting. Four armed and uniformed BPD officers were using such force against a lone male arrestee that the officers caught the attention of Ms. Clark and several other passers-by. Many of the witnesses were so concerned for the safety of the arrestee and the use of force by the BPD officers that they began recording the officers' conduct on their cell phones.

101. Concerned for the safety of the arrestee, Ms. Clark stepped slightly forward to get a better view of the force the BPD officers were using, but was still standing on a public sidewalk. At that point, the officers had the arrestee's head covered, and Ms. Clark was concerned that he could not breathe. Ms. Clark stepped forward calmly and remained several feet away from the officers who were forcefully effectuating this arrest. Despite the fact that Ms. Clark's conduct was entirely lawful, one officer yelled for her to "get back" and shoved Ms. Clark with extreme force, causing her entire body to become airborne. Ms. Clark landed, slamming to the ground with such force that other witnesses cried out in concern for her well-being. To cover up his misconduct, the officer, and the BPD, detained Ms. Clark and instituted false criminal charges against her. The officer issued Ms. Clark a summons and wrote a falsified report in which he attempted to portray his actions as justified. Those charges were dismissed.

102. Likewise, the City of Boulder is aware that, on August 26, 2018, a BPD officer arrested and assaulted Michele Rodriguez while she was attempting to call a supervisor with the

BPD.  The officer, and other members of the BPD, contacted Ms. Rodriguez and other individuals sitting outdoors, claiming there was an open alcohol container.  Video footage of the encounter reveals that Ms. Rodriguez was seated with no open alcohol containers in her vicinity.  The officer unlawfully ordered Ms. Rodriguez to sit down, and Ms. Rodriguez asked why needed to sit down if she was not under arrest.  The officer told Ms. Rodriquez she was being detained.  Ms. Rodriguez asked the officer why she was being detained, and repeatedly asked the officer to call his sergeant.  When the officer refused to call his sergeant, Ms. Rodriguez pulled out her cell phone and said "I'm going to call 911. Is that alright?"  Ms. Rodriguez was unlawfully told "No, we're already here."  Ms. Rodriguez told the officer "I need protection from you guys," and attempted to dial on her phone while she remained seated. The officer then told Ms. Rodriguez, "that's it, you're going to jail," slapped the phone out of her hands, and grabbed her by the arms. The officer threw Ms. Rodriguez to the ground and forced her into handcuffs as she continued to ask to call 911.

103.    To justify his conduct, the officer falsely charged Ms. Rodriguez with obstructing a peace officer and resisting arrest.  On April 2, 2019, the District Attorney dismissed the charge of resisting arrest.  On May 14, 2019, the citizens of the City of Boulder acquitted Ms. Rodriguez of Obstructing a Peace Officer.  After the assault and false charging against Ms. Rodriguez, Defendant City of Boulder failed to discipline, train, or adequately supervise the officer involved.

104.    As yet another example, on April 5, 2019, a BPD officer arrested Sammie Lawrence who was attempting to film the officer's conduct while ticketing a group of homeless people while in a public park.  Video footage of the incident reveals that Mr. Lawrence was respectful, stood at a distance from officers, and agreed to step back, but the officer still proceeded to arrest and assault Mr. Lawrence.  Mr. Lawrence was falsely charged with obstructing a peace officer and resisting arrest.

105.     As yet another example, on December 28, 2018, a BPD officer unlawfully arrested Jedon Kerr, applying excessive force during the arrest although Mr. Kerr was complying with the commands given to him.   The arresting BPD officer shoved his knee into Mr. Kerr's back until Mr. Kerr screamed in pain.   The unlawful arrest was in retaliation for recording outside of the Boulder County Jail and refusing to provide identification upon request to a BPD officer.   Mr. Kerr was booked into the jail, but then released with no charges filed.

106.     Finally, in a high-profile case of police harassment on March 1, 2019, preceding Ms. Salazar's unlawful arrest, a BPD officer pointed a weapon at university student Zayd Atkinson and repeatedly threatened him based on Mr. Atkinson lawfully declining to give the officer information about why he was present on a public sidewalk picking up and disposing of trash.   The officer's conduct, caught on bodycam video, shows that the officer became personally offended when Mr. Atkinson declined to provide information voluntarily to the officer, and that the officer escalated a situation that should have been a routine citizen encounter into a potentially deadly confrontation for the Boulder resident.   The BPD rewarded the arresting officer by paying him a severance package when he later resigned from the BPD.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – First Amendment Free Speech**
**(Plaintiff Salazar Against All Defendants)**

107.     Plaintiff Salazar incorporates here by reference all of the preceding paragraphs.

108.     At all times relevant to this Complaint, Defendants were acting under color of law.

109.     Ms. Salazar lawfully exercised her First Amendment right to refuse to have a private conversation with Officer Quayle.

110.     Ms. Salazar lawfully exercised her First Amendment right to refuse to speak with Officer Quayle without an attorney present.

111.    Ms. Salazar lawfully exercised her First Amendment right to record her encounter with officers of the BPD.

112.    Defendants' unlawful arrest of Ms. Salazar and unreasonable use of force against Ms. Salazar were motivated by and in retaliation for Ms. Salazar exercising her First Amendment rights.

113.    Defendants' arrest of Ms. Salazar and unreasonable use of force against Ms. Salazar would deter a person of ordinary firmness from engaging in similar expressive activity.

114.    At the time Defendants arrested Ms. Salazar, they did not have any information that would have provided probable cause for the arrest.

115.    Defendants' conduct violated clearly established rights belonging to Ms. Salazar of which reasonable persons in Defendants' position knew or should have known.

116.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

117.    Defendants acted pursuant to the custom, policy, and practice of Defendant City of Boulder, which condones, tolerates, and ratifies retaliation by its law enforcement officers against those exercising First Amendment rights.

118.    Defendant City of Boulder was aware of widespread retaliation by its law enforcement officers against those exercising First Amendment rights, as detailed above, and failed to properly train or discipline its employees for such retaliation.

119.    Defendant City of Boulder knew, or should have known, that their employees would retaliate against those exercising First Amendment rights, violating their constitutional rights.

120.    Defendant City of Boulder's policies, customs, or practices condoning its employees' retaliation was the moving force and proximate cause of the violation to Ms. Salazar's constitutional rights.

121.    Defendants' retaliatory arrest and use of excessive force caused injuries to Ms. Salazar in amounts to be proved at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment False Arrest**
**(Plaintiff Salazar Against All Defendants)**

122.    Plaintiff Salazar incorporates here by reference all of the preceding paragraphs.

123.    At all times relevant to this Complaint, Defendants were acting under color of law.

124.    Ms. Salazar was arrested without probable cause for her arrest or any other valid legal basis for her arrest.

125.    Defendants did not at any time have a reasonable basis for believing that Ms. Salazar was a danger to herself or others.

126.    Defendants did not at any time have a warrant authorizing any search, seizure, and detention of Ms. Salazar's body or belongings.

127.    At the time when Defendants arrested Ms. Salazar without probable cause, Ms. Salazar had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in her person from unreasonable searches and seizures.

128.    Defendants acted pursuant to the custom, policy, and practice of Defendant City of Boulder, which condones, tolerates, and ratifies its employees' continued arrests lacking in probable cause that are based solely on lawful First Amendment conduct.

129.     Defendant City of Boulder was aware of widespread continued arrests, which lack probable cause and are based solely on lawful First Amendment conduct, as detailed above, and failed to properly train or discipline its employees in response to these arrests.

130.     Defendant City of Boulder knew, or should have known, that their employees would continue to effectuate arrests that lack probable cause and are based solely on lawful First Amendment conduct.

131.     Defendant City of Boulder's policies, customs, and practices condoning its employees' continued arrests, which lack probable cause and are based solely on lawful First Amendment conduct, were the moving force and proximate cause of the violation to Ms. Salazar's constitutional rights.

132.     Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Ms. Salazar's constitutional rights.

133.     Defendants' false arrest of Ms. Salazar caused injury to her in amounts to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment Excessive Force**
**(Plaintiffs Salazar and S.S. Against All Defendants)**

134.     Plaintiffs incorporate here by reference all of the preceding paragraphs.

135.     At all times relevant to this Complaint, Defendants were acting under color of law.

136.     Defendants used excessive force against both Ms. Salazar and S.S. when arresting Ms. Salazar by slamming them against a vehicle, and then applying overly tight handcuffs to Ms. Salazar is such a manner as to injure her back because of the way her arms were contorted.

137.     Ms. Salazar complained about the inappropriate handcuffing but Defendants refused to take the needed steps to relieve Ms. Salazar from injury.

138.    At the time Defendants used excessive force against Plaintiffs, they were unarmed, were not fleeing from Defendants or resisting arrest in any way, and were not a threat to the officers or any other person.

139.    Plaintiffs suffered significant pain as a result of Defendants' use of force.

140.    Defendants' use of force against Plaintiffs was objectively unreasonable and unnecessary.

141.    At the time when Defendants used excessive force against Plaintiffs, the Plaintiffs had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in their persons from such excessive force.

142.    Defendants acted pursuant to the custom, policy, and practice of Defendant City of Boulder, which condones, tolerates, and ratifies its employees' use of excessive force during arrests to retaliate against persons and for no lawful policing purpose.

143.    Defendant City of Boulder was aware of widespread use of excessive force by its police officers, as detailed above, and failed to properly train or discipline its employees in response to this excessive use of force.

144.    Defendant City of Boulder knew, or should have known, that their employees would continue to use excessive force, and that this practice would cause injuries to persons in Plaintiffs' position.

145.    Defendant City of Boulder's policies, customs, or practices condoning its employees' use of excessive force was the moving force and proximate cause of the violation to Plaintiffs' constitutional rights.

146.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

147.    Defendants' use of excessive force against Plaintiffs caused injury to them in amounts to be proved at trial.

148.    With respect to the improper handcuffing, such injuries included bruising of Ms. Salazar's wrists and back injury, as well as pain and suffering and emotional distress.

## PRAYER FOR RELIEF

Plaintiffs Keri Leigh Salazar and S.S. pray for judgment to enter in their favor, and an award of all of the relief as allowed by law and equity, including but not limited to:

a.  Actual economic damages including but not limited to for medical bills;

b.  Compensatory damages for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

c.  Punitive damages for all claims;

d.   Pre-judgment and post-judgment interest at the highest lawful rate;

e.  Attorney's fees and costs; and

f.  Such other relief as justice so requires.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 27th day of May, 2020.

Respectfully Submitted,

_____*/s/ Daniel D. Williams*_____
Daniel D. Williams
John C. Clune
Hutchinson Black and Cook, LLC
921 Walnut Street, Suite 200
Boulder, CO 80302
(303) 442-6514
williams@hbcboulder.com
clune@hbcboulder.com

Attorneys for Plaintiffs