IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01497-KLM

KERI LEIGH SALAZAR; and
S.S., by her parents and next friends, Keri Leigh Salazar and Matthew Salazar,

      Plaintiffs,

v.

CITY OF BOULDER, COLORADO, a municipality;
OFFICER ED QUAYLE, in his individual capacity; and
OFFICER SHANE ROGERS, in his individual capacity,

      Defendants.

_____

## ORDER ON SUMMARY JUDGMENT
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendants' **Motion for Summary Judgment** [#12][1] (the "Motion").  Defendants seek summary judgment on Plaintiffs' claims alleging a violation of their civil rights in connection with an altercation in Boulder with Ms. Salazar and her four-year old daughter S.S., which resulted in Ms. Salazar being arrested.  Ms. Salazar claims that she was falsely arrested when she lawfully exercised her right to decline to be interviewed by a police officer, Defendant Officer Quayle, without legal counsel present.  *See Response Mot. Summ. J.* [#36] at 1.  Ms. Salazar asserts a Fourth Amendment false arrest and First Amendment retaliation claim, and both Plaintiffs assert

---

[1] [#12] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  This convention is used throughout this Order, and all cited page numbers refer to that docket number.

an excessive force claim.  Defendants assert that they had probable cause to arrest Ms. Salazar for suspected child abuse in connection with Plaintiff S.S., that the force used was reasonable, and that the First Amendment claim fails because the arrest was supported by probable cause.

The Court has reviewed the Motion [#12] and the conventionally submitted exhibits [#13] submitted in support, the Response [#36] and the conventionally submitted exhibits [#41] submitted in support, the Reply [#45], the case file, and the applicable law, and is sufficiently advised in the premises.  In accordance with Defendants' Notice of Partial Withdrawal of Motion for Summary Judgment [#51], the argument in the Motion [#12] that Plaintiff cannot establish liability for a municipal policy or custom of the City pursuant to *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), is **withdrawn**.  For the reasons set forth below, the remaining portion of the Motion [#35] asserting that the individual Defendant Officers are entitled to summary judgment is **GRANTED**.  Additionally, even though the portion of the Motion [#12] seeking summary judgment as to the municipal liability claim has been withdrawn, the municipal liability claim is **dismissed** as the Court finds that there are no constitutional violations by the Defendant Officers that could give rise to municipal liability.

## I.  Material Facts

Unless otherwise noted, the facts are undisputed.  The Court has not cited to the evidence when the facts are undisputed.  When the evidence is disputed, the Court has noted the dispute and cited to the evidence.

Many of the exhibits are body-worn camera ("body-cam") videos of the Boulder Police Officers who responded to the call.  The Court has reviewed the body-cam videos, which both parties rely on and whose authenticity is not disputed, and the Court must view the facts in the light depicted by the videos.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Thus, "[w]hen video footage firmly settles a factual issue, there is no genuine dispute about it[,] and the Court will accept facts clearly contradicted by the footage. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018).  This means that while a court considering a summary judgment motion based upon qualified immunity "'usually' must 'adopt [ ] . . . the plaintiff's version of the facts,' that is not true to the extent that there is clear contrary video evidence of the incident at issue."  *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (quoting *Scott*, 550 U.S. at 378-80); *see also Harper v. Rose*, No. 1:09-CV-153-TC, 2012 WL 1150463, at *4 (D. Utah April 5, 2012) ("If a videotape of the incident is in the record, anything depicted in the video that contradicts and makes unbelievable the plaintiff's characterization of the incident overrides the conflicting testimony.")  "If, however, the video 'depict[s] much of the encounter, but [leaves] open questions about the degree of [the defendant's] resistance to arrest and the timing and extent of force levied by" the officers, a genuine issue of material fact exists."  *Harper*, 2012 WL 1160463, at *4 (citing *White v. Martin,* 425 F. App'x 736, 743 (10th Cir.2011)).

Turning to the facts, curing the late afternoon of June 20, 2019, the Boulder Police Department responded to a 911 call from a clerk at the Jackalope store on the Pearl Street Mall.  The caller reported that two women had an argument, and one of them had locked herself in a back room.  The 911 call did not mention anything about a minor child.

Officer Ed Quayle was dispatched to the scene.  He spoke with Annie Moore, the person who had locked herself in the bathroom of the store.  Ms. Moore told Officer Quayle that Plaintiff Keri Salazar had been drinking, that Ms. Salazar's mother told her by phone that Ms. Salazar was a recovering alcoholic who was taking several medications, that Ms. Salazar appeared drunk to her after drinking "like three beers[,]" that Ms. Salazar's eyes were dilated, and that Ms. Salazar had fallen down in the store.

Ms. Moore went on to tell Officer Quayle that Ms. Salazar had "dropped her daughter in the middle of the road, like she put her down and pulled her over to the sidewalk, and she threw her keys and her bag down, she threw everything down," and that Ms. Moore picked up the keys. This was the first time that the presence of the minor child had been mentioned.

Ms. Moore said that when she picked up Mrs. Salazar's keys, Mrs. Salazar threatened her, and told her that she had locked her daughter in her truck with all the windows up.  Officer Quayle immediately asked Ms. Moore where the child was, and she told him that the child was in a truck nearby.  Officer Quayle then asked Ms. Moore to join him to look for the truck, saying "Let's try to find her before there is a problem."

On the way out of the Jackalope store, Officer Quayle asked an employee if she had seen a small child with Ms. Salazar.  The employee said Ms. Salazar had been alone in the store.

About fourteen minutes later, Officer Quayle and Ms. Moore found Ms. Salazar's truck in the 1300 block of Spruce Street in downtown Boulder with the driver's side door open.  Ms. Salazar and her daughter were sitting in the unlocked vehicle with the door

open.  Officer Quayle asked "Are you OK?"  Ms. Salazar said "Fine" and S.S. said "But we're in this hot car and Annie took our keys."

Upon initial arrival, Defendant Quayle indicated to Ms. Salazar that he needed to speak with her.  Ms. Salazar responded, "We're fine."  Defendant Quayle responded, "I need to talk with you" and Ms. Salazar again responded "We are fine."  Defendant Quayle replied, "Let me rephrase this, I need to speak to you directly."  Ms. Salazar again responded "We are fine."  Defendant Quayle then responded, "That's not going to cut it, I need to speak with you out here directly" to which Ms. Salazar responded, "I understand that but unless my lawyer is present, I am not speaking to you." Defendant Quayle responded "OK. Well that's going to go very bad for you tonight."  *Motion* [#12], Ex. 2, Axon Body 2 Video 2019_6_20_1800 (hereinafter "Ex. 2") at 19:45-21:03.  The parties dispute whether Officer Quayle's communications to Ms. Salazar about needing to speak to her were statements (as asserted by Plaintiffs) or questions (as asserted by Defendants).  Construing the evidence in the light most favorable to Plaintiffs, the Court will assume that these communications were statements, not questions.  It is undisputed, however, that Ms. Salazar refused to speak with Officer Quayle.

Defendants assert that Ms. Salazar then appeared to be starting to get out of her vehicle.  While Plaintiffs dispute this (Response [#36] at 3 ¶ 9), Defendants' assertion does appear to be accurate from the video.  At the very least, she was leaning out of the vehicle or towards her door.  Officer Quayle blocked Ms. Salazar from leaving with one hand, saying "Let me tell you something right now. You're going to end up in cuffs in a few seconds if you don't start cooperating with me. Do you understand me?"  Ex. 2 at

5

20:44-21:03.   Officer Quayle also said "I'd rather not be in a situation like this, and certainly not in front of your child.  That is inappropriate."  *Id.*

Ms. Salazar asked Officer Quayle, "What did I do?" and he told her "I need to speak with you in private."  When Ms. Salazar further inquired about why she was being questioned, Defendant Quayle stated that he could tell she was intoxicated and that she was not compliant with any of his lawful orders.  Ex. 2 at 22:01-22:37.

Ms. Salazar received a phone call from her mother-in-law and Defendant Quayle asked to speak with the caller.  Ex. 2 at 20:46-20:54.  Officer Quayle told Ms. Salazar's mother-in-law that she was intoxicated, and her mother-in-law responded that she was coming to pick Ms. Salazar and S.S. up.  *Id.* at 21:33-21:56.

Officer Quayle then asked Ms. Salazar to provide identification, and told her that the reason for this was "you're intoxicated, you have a child in the car, and you are attempting to leave."  Ex. 2 at 22:01-37.  Plaintiff did not provide her identification to Officer Quayle in the video, and denies intending to leave or having keys.  *Id.*  Defendants assert that the video shows that Ms. Salazar refused to cooperate or comply with the request for identification; Plaintiffs assert that Defendant Quayle abandoned the request.  *See Response* [35] at 3 ¶ 11; *Reply* [#45] at 1 ¶ 11.  Both  assertions appear to be correct from the Court's review of the video.

A bystander brought Ms. Salazar a cup of water and she thanked the bystander.  Ms. Salazar appeared to begin recording the bystander with her phone and asked him to confirm that when he approached her, the vehicle's door was open.  Upon further dialogue, the bystander indicated that Ms. Salazar had been sitting in the car for about

an hour.   Plaintiff asserts that when the bystander tried to give additional information, he was cut off mid-sentence by Defendant Rodgers who said, "We appreciate it sir, thank you very much."   Ex. 2 at 23:20-23:45.   Defendants assert, however, that the video establishes that the bystander was free to continue to speak if he wished.   *Reply* [#45] at 3 ¶ 13.  The Court agrees, finding that while the bystander was cut-off mid-sentence, he was not prevented from continuing to speak if he wished.

Defendants assert that while Ms. Salazar was denying having her keys, the bystander returned, and she began recording him again.   *Motion* [#12] at 4 ¶ 13. According to Defendants, Ms. Salazar yelled at the bystander when he appeared to be leaving, and then exited the vehicle with S.S. holding on to her and began to pursue the bystander.   *Id.* (citing Ex. 2 at 23:21-54; Ex. 3, Axon Body 2 Video 2019_06_20_1820 ("Ex. 3") at 3:26-3:41.  Ms. Salazar held a cup in one hand and a phone in the other, with her child on her lap.   *Id.*  Plaintiffs dispute these assertions, arguing that it is impossible to determine from the video the sequence of these events or whether the bystander in fact "returned" or had been there the whole time.   Additionally, Plaintiffs assert that Ms. Salazar did not yell "at" the bystander, and the video does not depict whether or not the bystander was leaving. *Response* [#36] at 4 ¶ 13.  The Court finds from its review of the video that while it is unclear whether the bystander initially "returned" to the scene, it does appear that the  bystander then appeared to be leaving or retreating, and that Ms. Salazar raised her voice to the bystander, presumably in order for the bystander to hear her. Defendants are correct that Ms. Salazar then exited the vehicle with a cup in one hand and a phone in the other, and while holding on to her child, in an apparent attempt to

7

pursue the bystander.  Ex. 2 at 23:21-23:55; Ex. 3 at 3:26-3:41.

According to the Motion, with Ms. Salazar's back turned to him while she apparently attempted to pursue the bystander, Officer Quayle grabbed her.  *Motion* [#12] at 4 ¶ 14 (citing Ex. 2 at 23:54).   Defendants further state that the video establishes Ms. Salazar's progress away from the vehicle.  *Id.*   Plaintiffs dispute the video evidence that Ms. Salazar had exited the vehicle and had her back fully turned to Officer Quayle by pointing out that she never actually left the scene.  *Response* [#36] at 2 ¶ 14.  Plaintiffs also assert that it is undisputed that Officer Quayle prevented her from leaving.  *Id.*  The Court finds that the video does show Ms. Salazar exiting the vehicle and beginning to leave the scene, with her back to Officer Quayle, although she is still near the end of her vehicle when she was stopped by Officer Quayle when he grabbed her arm.   Ex. 2 at 23:45-25:30; Ex. 3, 3:20-3:40.  Thus, Ms. Salazar was stopped next to the back door of her vehicle, while she was holding her child.  *Id.*  The Court also finds from a review of the video that when Officer Quayle grabbed Ms. Salazar, he pushed or thrust her towards the car adjacent to her, apparently so that he could handcuff her, and S.S. was pinned in between Ms. Salazar and the adjacent car.

Officer Rodgers then took S.S. by the hand, grabbed her body with his other hand, and, according to Defendants, removed her from the dangerous situation.  *Motion* [#12] at 5 ¶ 15 (citing Ex. 3 at 3:30-3:39).  Plaintiffs dispute whether Defendants "removed" the child from a dangerous situation, or placed her in one (Response [#35] at 3 ¶ 15); nonetheless, the video shows that S.S. was taken from Ms. Salazar by Officer Rodgers, and Ms. Salazar was then handcuffed.  *Id.* at 3:20-5:10; *see also* Ex. 2 at 23:53-24:56.

8

Officer Rodgers asserts, and Plaintiff does not dispute, that he held S.S. for a total of 49 seconds, during which time he confirmed that S.S. knew Ms. Moore, and then handed the child over to Ms. Moore.  *See* Ex. 3 at 3:39-4:28.

Defendants assert that Ms. Salazar resisted, but Officer Quayle was able to put her in handcuffs.  *Motion* [#12] at 5 ¶ 16 (citing Ex. 2 at 23:54-24:49).  Plaintiffs dispute that Ms. Salazar resisted (Response [#36] at 3 ¶ 16), but the video does show Ms. Salazar struggling while Officer Quayle is trying to put the handcuffs on and him asking her to "stop resisting."  Ex. 2 at 23:54-24:49.  Plaintiffs further note that no reference is made to resistance of any kind in Defendant Quayle's report concerning the incident, but that report does say that he "struggled to handcuff" Ms. Salazar.  *Id.*, Ex. A at 1.  Plaintiffs also assert that Ms. Salazar was arrested by Officer Quayle at that time.  *Id.*  Defendants dispute this only to say that whether Ms. Salazar was arrested is a legal conclusion, not an actual one.

Defendants assert, and the Court agrees, that S.S. confirmed that she had been alone in the car when asked.  *Motion* [#12] at 6 ¶ 23.  Plaintiff disputes this, stating that S.S. gave conflicting answers.  *Response* [#36] at 3 ¶ 23.  The Court disagrees with Plaintiff.  When S.S. was asked if she was alone in the car for a while, S.S. initially said no but then immediately said in a more forceful voice, "yeah but mom came back, she was looking for her keys."  Ex. 2 at 39:15-17.  The second part of S. S.'s answer provided sufficient detail to resolve any perceived conflict in her initial response.  Moreover, S.S. later confirmed that she had been left alone in the truck with the doors closed and that it was "so hot."  *Id.* at 1:01:01-1:01:20.  The Court also notes that another officer who was

9

speaking with S.S. reported to Officer Quayle that S.S. told her that she was locked in the car for about 15 minutes, she was sweaty, and she thought she'd be in there forever.  *Id.* at 55:55-60.

SS stated to officers on the scene that she had been injured as a result of Defendants' conduct.  Def.'s Ex. 4, AXON_Body_2_Video_2019-06-20 1844 (hereinafter "Ex. 4") at 0:00-0:29; Pl. Ex. C., AXON_Body_2_Video_2019-06-20 1824-2 Video ("Ex. C") at 19:48-21:00 (S.S. stating that the "officer banged [Ms. Salazar] toward the car" and it cut" me).

While in handcuffs in the back of the patrol vehicle, Ms. Salazar inquired, "What am I under arrest for?"  Defendant Rodgers responded, "I'm detaining you to figure out what is going on."  When Ms. Salazar again asked what she had been *arrested* for, Defendant Rodgers stated that she was being detained "to figure out what's going on" and for the  "investigation of a possible third-degree assault."  Ex. 3 at 10:57-11:05.  A few minutes later when Ms. Salazar again inquired about her arrest, Officer Rodgers stated that she was being arrested on a possible crime, possible third-degree assault, and that he would let her know what the crime was.  *Id.* at 15:54-16:50.

 Defendant Rodgers recited Ms. Salazar's rights under *Miranda v Arizona*, and asked if she understood the rights.  Ms. Salazar responded, "I have no idea what you are talking about."  Upon that response, Defendant Rodgers responded "Alright, I'm going to ask you questions then. Ex. 3 at 10:55-11:44.

At all times prior to Ms. Salazar's arrest, including during the time when Ms. Moore was suggesting to police that Ms. Salazar had locked her daughter S.S. in a vehicle,

Ms. Moore was in possession of Ms. Salazar's car keys.  Defendants were aware that Ms. Salazar did not have her keys.  Ms. Salazar asking for her keys from Ms. Moore was, in fact, the basis for their conflict.

After Ms. Salazar was handcuffed and placed into a patrol car, Officer Quayle met on the scene with another officer to discuss the situation.  Officer Quayle narrated that he thought that Ms. Salazar was "probably intoxicated" based upon Ms. Moore's report of Ms. Salazar falling down in the store, and that he grabbed her before she could take off running with her child.  Ex. 2 at 28:30-57.  The Court notes that Officer Quayle also said that Ms. Salazar was absolutely refusing to comply in any way, and that she had her four-year old child in her lap when she jumped out of the car.  *Id.*  Additionally, Officer Quayle said that Ms. Salazar "left her daughter in the friggin car while they all went out to lunch," *id.* at 28:54-28-57, a contention that Plaintiffs say was not suggested by anyone.  *Id.*  After a few more minutes, Officer Quayle talked to one of the bystanders and said, "We came up here for an entirely different situation[,]" referring to the report of a child locked in a car.  *Id.* at 26:07-26:15.  A moment later, Officer Quayle stated that it escalated pretty quickly, that "it's ridiculous, we're trying to make sure she didn't drive off intoxicated."  *Id* at 26:17-26:23.  He stated that Ms. Salazar was "not that drunk[,]" *id.* at 29:07-29:10, and then stated to another officer, "[t]his was something entirely minor and it escalated.  Not very big."  *Id.* at 29:26-29:31.  He also stated that "we're still trying to figure everything out."  *Response* [#36], AXON_Body_2_Video_2019-06-20 1824-3 ("Ex. B") at 1:51-1:54.  Finally, Officer Quayle stated that the person they originally contacted at the Jackalope (presumably Ms. Moore) would be listed as the victim.  *Id.* at 2:10-2:11.

Plaintiffs assert that the officers were discussing how to explain the arrest, contemplating possible theories. *Response* [#36] at 6 ¶ 28 (citing Ex. 2 at 29:00-29:35; Ex. B at 1:51-2:17 and 3:27-4:14; Ex. 4 at 4:15-4:20). Defendants do not dispute the conversation in the video, but assert that Plaintiffs' speculation about the officers' motives is not supported by the evidence and is not material to the question whether probable cause existed to arrest Ms. Salazar for child abuse. *Reply* [#36] at 4 ¶ 28. The Court agrees. The Court construes the video as an explanation by Officer Quayle to Officer Rodgers of what he believed happened, including that 1) Mrs. Salazar was intoxicated; 2) she allegedly left her daughter locked in the car while she had lunch; 3) she also allegedly got into a fight with her cousin Ms. Moore at the store; 4) she got into a screaming match with the officers and was refusing to comply with their orders, and 5) she jumped out of the vehicle with her daughter and the officers stopped Ms. Salazar before she went running with the child in her hand. Ex. 2 at 3:27-4:30; *see also* Ex. 4 at 4:1-4:20 ("information is kind of a hodge podge and we're figuring it out").

It is undisputed that Ms. Salazar complained about the significant pain from the handcuffs throughout her arrest and detention. An emergency medical technician examined Ms. Salazar while she was handcuffed. He did not indicate in any way that he suspected she might be having a seizure.

Subsequent to the emergency medical technician's examination, Officer Quayle spoke with Matt Salazar, Ms. Salazar's husband, over the phone as he had not yet arrived at the scene. Office Quayle told Mr. Salazar "We ended up taking her into custody because she jumped out of the car with your daughter."

Plaintiffs allege in their Complaint [#1] that Mr. Salazar told Officer Quayle that Ms. Salazar "had recently been diagnosed with a seizure disorder that affects her behavior and causes aggression" and that the seizure disorder was a "temporal lobe" seizure disorder that caused Ms. Salazar "to fall . . . and display features consistent with tonic-clonic." *Id.* at 13 ¶ 71. They further allege that "Officer Quayle explained he understood the nature of that seizure disorder." *Id.* It is undisputed that none of this is supported by the body-cam recording of the conversation. While Mr. Salazar's side of the conversation cannot be heard, Officer Quayle said nothing that indicated that Mr. Salazar said anything about a seizure disorder, much less anything that could be interpreted as an explanation that Officer Quayle understood the nature of the alleged seizure disorder. *Motion* [#12], Ex. 2 at 50:00-52:23.

Later, when Officer Rodgers asked Officer Quayle "what charges do we have?," Officer Quayle responded "First off, child abuse" and then went on to detail how the child was left in the car with the windows rolled up during 87º weather. The officers discussed the possibility of also charging Ms. Moore with child abuse but decided not to do so at that time.

The Complaint [#1] alleges that Plaintiff was taken to the Boulder Community Hospital, and then transported to the Boulder County Jail for booking. *Id.* ¶¶ 79-83. She was released the next day. *Id.* ¶ 84.

It is undisputed that Ms. Salazar was charged with one count of Child Abuse, C.R.S. 18-3-601, which was dismissed by the District Attorney's Office on their own motion citing a lack of reasonable likelihood of success at trial.

13

## II.  Standard of Review

**A.      Summary Judgment**

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Pursuant to Fed. R. Civ. P. 56(a), summary judgment should be entered if the pleadings, the discovery, any affidavits, and disclosures on file show "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the case under the governing substantive law.  *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323).  When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Id.* at 671.  If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor.  *See Anderson*, 477 U.S. at 248.  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him.  *Adickes v.*

*S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324).

Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).   The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded.  *See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017).   Additionally, "[w]hen opposing parties tell two different stories," one of which is "contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.

## B.   Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (citation omitted).   When qualified immunity is asserted, a plaintiff must show that: "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established."  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

"The determination of whether a violation occurred under the first prong of the qualified immunity analysis turns on the substantive law regarding that right."  *Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1255 (D. Colo. 2010).  "With regard to the second

[prong], the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented." *Herrera*, 589 F.3d at 1070 (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008)).

### III.  Analysis

Plaintiff's remaining claims asserted pursuant to 42 U.S.C. § 1983 allege (1) retaliation in connection with the exercise of Ms. Salazar's First Amendment Free Speech rights by refusing to speak with Officer Quayle without an attorney present and recording the incident; (2) Fourth Amendment false arrest by Ms. Salazar on the basis that Defendants did not have probable cause or any other reason to arrest her; and (3) Fourth Amendment excessive force by both Plaintiffs in connection with allegedly being slammed against a vehicle and the application of overly tight handcuffs to Ms. Salazar.  Defendants assert that they are entitled to qualified immunity and dismissal of all claims.  The Court addresses each claim below, beginning with the Fourth Amendment claims.

### A.    Fourth Amendment False Arrest

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . ."  U.S. Const. amend. IV; *United States v. Windom*, 863 F.3d 1322, 1327 (10th Cir. 2017).  In analyzing the constitutionality of officer action, "the touchstone of [the court's] analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."  *Windom*, 863 F.3d at 1327

(quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).

Defendants argue that they had a reasonable suspicion to briefly detain Ms. Salazar to determine whether she had abused her child, and that they did not use force to detain Ms. Salazar until she exited the vehicle to pursue a bystander and turned her back to Officer Quayle. *Motion* [#12] at 1, 8. Defendants also assert in their Motion [#12] that Ms. Salazar's arrest was supported by probable cause, *id.* at 8, but argue incongruently in their Reply [#45] that Plaintiffs incorrectly argue that Ms. Salazar was subject to arrest when she was placed in handcuffs, asserting that "[t]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest." *Id.* at 5 (citation omitted). Construing the evidence in the light most favorable to Plaintiffs, the Court finds for purposes of summary judgment that Ms. Salazar was arrested as Plaintiffs contend when she was stopped outside her vehicle by Officer Quayle and handcuffed. *See Cortez v. McCauley*, 478 F.3d 1108, 1113, 1115 (2007) (defendant who was seized, handcuffed, and placed in the back of a patrol car was arrested).[2] The issue then becomes whether the arrest was supported by probable cause.

The Fourth Amendment allows a warrantless arrest if an officer has "probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy

---

[2] In fact, Officer Rodgers told Ms. Salazar that she was arrested, which occurred after she was handcuffed and placed in the car. *Motion* [#12], Ex. 3 at 15:54-16:50. Further, Officer Rodgers and Officer Quayle discussed the basis for the *arrest*. *Id.*, Ex. 2 at 53:33-54:45.

information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). The determination as to whether probable cause exists is based on the totality of the circumstances. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Courts assess probable cause "from the standpoint of an objectively reasonable police officer." *Donahue v. Wihongi*, 948 F.3d 1177, 1189 (10th Cir. 2020) (quoting *Ornelas v. United States*, 517 U.S. 690, 691 (1996)). When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff[,]" even if the officer "reasonably but mistakenly conclude[s] that probable cause is present." *Romero*, 45 F.3d at 1476. The probable cause analysis concerns what the officer knew at the time of the arrest, not later-acquired evidence. *Cortez*, 478 F.3d at 1116.

In the case at hand, Defendants argue that the video, audio and other evidence demonstrates that an objectively reasonable officer would have had probable cause to arrest Ms. Salazar for misdemeanor child abuse under C.R.S. § 18-6-401(1)(a). *Motion* [#12] at 9. That statute provides that "[a] person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health." *Id*. C.R.S. § 18-6-401(7)(b)(ii) makes child abuse that does not cause injury, but is committed with criminal negligence, a misdemeanor.

18

The Court agrees with Defendants that at the time of the arrest, Officer Quayle first contacted Ms. Salazar, an objectively reasonable officer could have believed that the child S.S., aged four, had been left in a vehicle for at least some amount of time on a day where the temperature was 87 degrees.  Annie Moore informed Officer Quayle at the beginning of the encounter that Ms. Salazar told Ms. Moore that she locked her daughter in her truck with all the windows up.  Further, Officer Quayle knew from speaking to a Jackalope employee that S.S. was not present at the store when Ms. Salazar and Ms. Moore were in the store arguing, and Officer Quayle was told by Ms. Moore that S.S. was in the truck.  When Officer Quayle found Ms. Salazar, S.S. was in fact in the "hot" truck, confirming what Ms. Moore had said.  Ex. 2 at 19:25-19:39.

Plaintiffs argue, however, that Ms. Moore had no firsthand knowledge that S.S. had been locked in the car, and that Ms. Moore's statement is not trustworthy.   Plaintiffs assert that the statement lacked trustworthiness because (1) Ms. Moore was not known to the Defendant Officers; (2) she had no independent information supporting her statement and it was double hearsay; (3) no witness corroborated that S.S. had been left in a vehicle unattended; (4) Ms. Moore appeared agitated and confused during the encounter with Defendants and could not recall the location of the vehicle which was only two blocks away (Ex. 2 at 6:10-19:00); (5) Ms. Moore admitted to having two drinks that afternoon, and her eyes appeared red (Response [#36], Ex. A), (6) Ms. Moore informed Defendants that she had Ms. Salazar's keys (Ex. 2, 6:35-7:25); and (7) upon encountering the vehicle, Defendants could see that the vehicle was unlocked with the door open and Ms. Salazar and her child sitting inside; S.S. confirmed that they were waiting in the

vehicle because "Annie [Moore] took our keys" (*id.* at 19:25-41).   *Response* [#36] at 7-8.

Plaintiffs also argue that the Defendant Officers did not corroborate Ms. Moore's

statement that Ms. Salazar had said she had locked the child in the vehicle by conducting

an investigation.

When an arrest is premised on a witness statement, the Court must determine if

the witness statement constituted reasonably trustworthy information.   *See Romero v.*

*Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).  The plaintiff has the burden of demonstrating

that the statement did not constitute reasonably trustworthy information.   *Id.* In addition,

"the probable cause standard . . . requires officers to reasonably interview witnesses

readily available at the scene, investigate basic evidence, or otherwise inquire if a crime

has been committed at all before invoking the power of warrantless arrest and detention."

*Id.* at 1476-77.   Police officers "may not ignore easily accessible evidence and thereby

delegate their duty to investigate [to others]."  *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252,

1259 (10th Cir. 1998).

Here, the Court first finds that Plaintiffs have not meet their burden of

demonstrating that the statement was not reasonably trustworthy.  Contrary to Plaintiffs'

assertion, the arrest was not premised solely on the statement of Ms. Moore.   As

previously noted, a Jackalope  employee had told the officers that S.S. was not present

at the store when Ms. Salazar and Ms. Moore were in the store arguing, and the officers

were responding to a 911 call.  Further, when Defendants reached Plaintiffs, S.S. was in

the vehicle where Ms. Moore said she had been, and S.S. told the Defendant Officers

that "we're in this hot car."  Ex. 2 at 19:25-19:39.  While not relevant to the probable cause

determination, the Court notes that S.S. later confirmed that she had been left alone in the car.  *Id.* at 39:15-39:17, 101:01-1:01:20.

As to the alleged lack of an investigation, after speaking with Miss Moore, Officer Quayle attempted, repeatedly, to speak with Ms. Salazar, but she refused to speak to him or cooperate.  This is not a situation where either of the Defendants closed their "eyes to facts that would clarify the circumstances of an arrest."  *Cortez*, 478 F.3d at 1117 (quoting *BeVier v. Hucal*, 806 F.3d at 123, 128 (7th Cir. 1986)).  Additionally, after Ms. Salazar was arrested, the body-cam videos show Defendants speaking to S.S. and Ms. Moore about what happened (Ex. 2 at 39:22-29, 41:36-47:22), with both S.S. and Ms. Moore verifying that S.S. was in the vehicle alone.  *Id.*  Ms. Moore estimates that S.S. was alone in the vehicle for about 20 minutes.  *Id.* at 41:36-42:22.  Defendants also spoke to two bystanders.  *Id.* 25:54-27:54; Ex. B at 27:18-45.  Thus, the argument that Defendants should have done something further in connection with an investigation is rejected.

The facts here are completely different from those in the cases relied on by Plaintiffs.  In  *Cortez*, the officers relied, without any investigation, exclusively on the double-hearsay statement of a nurse relaying over the telephone that a child's mother had "ostensibly heard" that her "barely-verbal two-year old child" said "that her babysitter's 'boyfriend' had 'hurt her pee-pee."  478 F.3d at 1116.  While the Tenth Circuit made clear that hearsay may be usable as a source of probable cause for a warrantless arrest, it found in that situation that the defendant erred in failing to conduct any other investigation or interview the nurse, mother, or  child, and in relying solely on the hearsay statement in arresting the boyfriend.  *Id.* at 1117-18. The court stated, "unsubstantiated

double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause[,]" which "should have been patently obvious to any reasonable law enforcement officer." *Id.* at 1118.  In *Baptiste*, the court affirmed the denial of qualified immunity for officers who relied solely on statements of store security guards about a shoplifting encounter, and failed to review a videotape that was readily available to them of the "very conduct which they knew served as the basis for the guard's allegations[,]" in a situation where the plaintiff explained her actions and produced the receipts for the allegedly stolen goods.  147 F.3d at 1256-57.

Plaintiffs also assert that if the information from Ms. Moore that she had the keys was reliable, this means that Ms. Salazar was actually trying to get the keys so she could release S.S. *out* of the car.  *Response* [#36] at 10.  There is no evidence, however, to support this.  The Court notes from its review of the videos that when the Officers found Ms. Salazar, she was waiting in the car with S.S., not trying to get the keys.

Plaintiffs next assert that the likelihood of the statement attributed to Ms. Salazar that she had locked her child in the car when she didn't have the keys should have immediately given any reasonable officer pause to consider the accuracy of the witness's report, and was another indication that S.S. could not have been locked in the car. *Response* [#36] at 9.  Further, Plaintiffs aver that S.S.'s confirmation that Ms. Moore took the keys also indicates that she could not have been locked in the car.  *Id.*  Again, the Court does not agree.  First, the Court notes that it is not clear from the videos when Ms. Moore actually took possession of the keys.  It is clear, however, that Ms. Moore told the Defendant Officers that Ms. Salazar relayed to her that she had locked S.S. in the

vehicle, and it is apparent from the videos that she was upset.  An objectively reasonable officer in Officer Quayle's position could believe that S.S. had been abandoned in a hot vehicle that may or may not have been locked, and that this occurred for at least for the duration of Ms. Salazar and Ms. Moore's visit to the Jackalope store.  This was ultimately supported by the statement from S.S. in response to the question by Officer Quayle as to whether she was alone in the vehicle that "No, *yeah but Mom came back*, she was looking for her keys."  Ex. 2 at 39:22-39:29.  Moreover, the Defendant Officers were not required to assume that Ms. Salazar could not have somehow locked the doors, even without keys, nor presume that a four-year-old child would be willing and able to open an unlocked car door or roll down the window by herself, particularly if she was told to stay in the car.

It is also argued by Plaintiffs in contending that probable cause did not exist to arrest Ms. Salazar that upon arriving on scene, S.S. was not locked in a vehicle, was not in  distress, and was in sitting on her mother's lap.  *Response* [#36] at 10-11.  This does not, however, necessarily mean that S.S. had not been in danger previously or under a threat of injury.  Again, the Court finds that an objectively reasonable officer could believe from the totality of the circumstances discussed herein that at the very least, S.S. was in the hot vehicle by herself for some unspecified period of time while Ms. Salazar went to the Jackalope store.  While Plaintiffs assert that a bystander is heard on the body-cam footage immediately prior to the arrest confirming Ms. Salazar's assertion that she had been there with S.S. for an hour (Ex. 2 at 23:00-23:20), this does not mean that S.S. could not previously have been left in the car alone.  In fact, Ms. Salazar and her cousin were previously in the Jackalope store without S.S., leading to a reasonable inference that S.S.

may have been in the vehicle at that time.

Finally, Plaintiffs point out that after the arrest, Defendant Rodgers stated that Ms. Salazar was being arrested for "possible third-degree assault," which was a theory that did not involve S.S. at all. *Response* [#36] at 11 (citing Ex. 3 at 10:55-12:30). Plaintiffs also argue that Defendants debated how to explain the arrest, and that after huddling together, they chose to justify the arrest based on Ms. Salazar allegedly leaving S.S. unattended in the car. *Id.* (citing Ex. 2 at 53:30-56:40). According to Plaintiffs, Defendants' inability to land on a basis for arrest is indicative of the fact that, objectively, there was no probable cause to arrest Ms. Salazar for child abuse. *Id.* at 11-12. The Court disagrees with Plaintiff's characterization of the fact that the officers were unable to "land on a basis for arrest" or that they debated about how to explain the arrest, as this is not supported by the evidence and is speculative. Moreover, even if the officers had debated the basis of the arrest, Plaintiffs have cited no authority that this is unconstitutional or somehow detracts from the probable cause determination for the ultimate basis on which an arrest was made. Based on the foregoing, the Court finds that the arrest was supported by probable cause, and that the Motion [#12] should be granted as to the false arrest claim. Further, because there was no constitutional violation, the Defendant Officers are entitled to qualified immunity on this claim.

**B.    Fourth Amendment Excessive Force Claim**

**1.    Ms. Salazar**

Plaintiffs argue that Ms. Salazar was first subjected to excessive force when she and her daughter were pushed up against the vehicle next to them. *Response* [#36] at

13.   They assert that as Defendants allege only that Ms. Salazar was committing a misdemeanor, no force was justified under the circumstances, and the force exhibited by Defendants in the body-cam footage was clearly excessive.  *Id.* at 14.

Turning to the Court's analysis, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id.*  The proper application of the Fourth Amendment "requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  "The court must look to the 'reasonableness' of the use of force, judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  Where the underlying crime is a misdemeanor, courts have held that an officer should use minimal force to effect an arrest."  *Surat v. Klamser*, No. 19-cv-00901-WJM-NRN, 2021 WL 2935948, at *4 (citing cases).

Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97.  "As in other

Fourth Amendment contexts, the reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

The Court finds that the *Graham* factors support the conclusion that Officer Quayle was justified in using force to arrest Ms. Salazar and in handcuffing her.  First, child abuse, even misdemeanor child abuse, is a severe crime because it implicates the safety of a minor who in this case was in the custody of the suspected abuser.  Second, Ms. Salazar was refusing to comply with Officer Quayle's requests and appeared to be intoxicated, consistent with Ms. Moore's statement to Officer Quayle; she had appeared to be attempting to leave her vehicle during their conversation; and at the time of the apprehension of Ms. Salazar, she had jumped out of the car with her child clinging to her in an apparent attempt to pursue a bystander, resulting in her back being turned to Officer Quayle.  This could be viewed as indicative of trying to leave the scene.  When Officer Quayle stopped Ms. Salazar and attempted to handcuff her, she continued not to comply, struggling with Officer Quayle, which resulted in him telling her to stop resisting.

Third, and most importantly, when Ms. Salazar left the vehicle to pursue the bystander, her hands were full and S.S. was grasping on to her, which an objective officer could believe posed a threat of harm to S.S.  If Ms. Salazar stumbled or fell, S.S. may have fallen and been injured.  This was a reasonable possibility given that Officer Quayle had been told that Ms. Salazar was intoxicated and confirmed it for himself (*Motion* [#12], Ex. 2 at 22:01-22:37), and that she had already fallen that afternoon and had separately

dropped her child.  Under the totality of the circumstances, the Court finds that Officer Quayle was justified in connection with his apprehension and decision to use force to detain Ms. Salazar and to handcuff her.

Additionally, the amount of force used appears to be minimal.  Officer Quayle firmly grasped Ms. Salazar's arm (*Motion* [#12] at 5 and Ex 2. at 23:54), and pushed or thrust her towards the adjacent vehicle to stop her.  From the court's review of the video, Officer Quayle did not "slam" or "throw" Ms. Salazar against the vehicle, as suggested by Plaintiffs (Complaint [#1]  at 9 ¶ 46), and the push was not violent.  *Cf. Jones v. Montgomery*, No. 15-1142, 2016 WL 5947347, at *7 (W.D. Tenn. Oct. 13, 2016)  (holding that "not every push or shove" violates the Fourth Amendment, but that a "violent shoving a defendant against a wall or other such structure while arresting him" has been held to be an unlawful use of force, absent circumstances such as flight, general unruliness, or danger on the part of the arrestee") (citing cases).  There were no additional, gratuitous applications of force, and Ms. Salazar continued to struggle the entire time Officer Quayle was attempting to handcuff her.  *Cf. McCowan v. Morales*, 945 F.3d 1276, 1283-84 (10th Cir. 2019) (evidence that officer gratuitously used force against a subdued and fully compliant misdemeanant arrestee was sufficient to defeat officer's motion for summary judgment).

Moreover, there is no evidence that Ms. Salazar was actually injured from the arrest.  The Tenth Circuit generally requires "some actual injury that is not de minimis, be it physical or emotional."  *Cortez*, 478 F.3d at 1129.  While the Court acknowledges "that there is no "'bright-line' standard dictating that force cannot be 'excessive' unless it leaves

visible cuts, bruises, abrasions or scars", *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001), and the Tenth Circuit has found excessive force even where an injury was de minims, those cases involved a much more egregious use of force. *See id.* (affirming district court's determination of excessive force when officers held children at gunpoint in connection with a raid even after the officers had gained complete control of the situation); *Buck v. City of Albuquerque,* 549 F.3d 1269, 1275, 1290 (10th Cir. 2008) (finding that despite district court's determination that any injury was de minimis, a jury could find excessive force when plaintiff did not attempt to flee or pose a threat, and plaintiff was pushed face down onto the pavement, kneed in the small of his back, pinned to the ground, handcuffed, and exposed to tear gas).  Finally, there is no evidence in the record that Officer Rodgers applied any degree of force in detaining Ms. Salazar.

Based on the foregoing, the Court finds that there are no genuine issues of material fact regarding the use of force in connection with Ms. Salazar's arrest, and that a reasonable jury could not find that the Defendant Officers used excessive force in detaining Ms. Salazar.

Plaintiffs also claims the officers used excessive force by applying "overly-tight handcuffs" that "contorted her arms and injured her back[,]" and that "despite repeated about the pain she was experiencing, Defendants refused to help Ms. Salazar or relieve her suffering." *Response* [#36] at 14.  Ms. Salazar submits a Declaration in support of this, stating that the handcuffs were too tight and caused her "extreme pain[,]" that she had bruising on both sides of her wrist that lasted seven to ten days, and that the handcuffing "exacerbated a prior shoulder injury" and "caused my shoulder to dislocate

which caused extreme pain." *Id.*, Ex. E, ¶¶ 2, 4, 6.  Ms. Salazar states that the damage the handcuffing caused to her shoulder "left me with pain that remained for several months."  *Id.* ¶ 5.

The Tenth Circuit has determined that "unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight."  *Cortez*, 478 F.3d at 1129.  "To recover on such an excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional."  *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (quoting *Cortez*, 478 F.3d at 1129 n. 25).

As a threshold matter, there is no evidence in the record that Officer Quayle had any knowledge of Ms. Salazar's complaints about the overly-tight handcuffs.  Plaintiffs confirm that this portion of the excessive force claim is not directed at Officer Quayle. *Response* [#36] at 15 n. 5.  Accordingly, the overly-tight handcuffing excessive force claim is dismissed as to Officer Quayle as a matter of law.  *See Cortez*, 478 F.3d at 1129.

Turning to Defendant Rodgers, the record reflects that Ms. Salazar repeatedly complained about the tightness of the handcuffs and that she was experiencing significant pain.  Thus, after being placed in the police car, Ms. Salazar requested that the handcuffs be removed because they were uncomfortable and too tight.  *Motion*, Ex. 3, beginning at 8:26.  Thereafter, Ms. Salazar engaged in conversation with Officer Rodgers for a few

minutes about why she was being arrested, and then made her second request to have the handcuffs removed or loosened to which Officer Rodgers responded that he would check them in a moment to make sure they had the appropriate space. *Id.* at 12:36-13:22. Shortly thereafter, an EMT checked on Ms. Salazar and asked if she had any injuries other that the visible scrapes to her knees (which are not alleged to have occurred from the incident at issue), to which Ms. Salazar indicated "Yes" but refused to elaborate on what those injuries were. *Id.* at 15:30-17:35.

Next, Officer Rodgers inspected Plaintiff's handcuffs and confirmed that there was enough room for her wrists (Ex. 3 at 16:55-17:09); nonetheless, Officer Rodgers loosened the handcuffs to make sure there was sufficient room, and told Ms. Salazar that he double-locked the handcuffs to ensure that they did not tighten. *Id.* at 18:20-20:35. Officer Rodgers thus acted within minutes of Plaintiff's complaints about the handcuffs and the pain she was experiencing. Accordingly, Plaintiffs' argument that Officer Rodgers failed to respond to Ms. Salazar's complaints is rejected.

Despite Officer Rodgers loosening the handcuffs, Ms. Salazar continued to complain of pain, stating she was a "woman' and "so boney[], and asked that the cuffs be put in front instead of behind her. Ex. 4 at 6:46-7:21. Officer Rodgers declined that request, but fastened Ms. Salazar's seatbelt. *Id.* That then ended Officer Rodgers' contact with Ms. Salazar as he asked another officer to transport her to the hospital for medical clearance. Id. at 7:21-7:32. At no time during this interaction did Ms. Salazar complain of any back or shoulder injury or any other injury other than her wrists hurting. See id. at 6:47-7:20; Ex. 3 at 8:36-20:40. While Plaintiffs assert in a summary fashion

that the video evidence documents both "physical" injury and "emotional" injury (Response [#36] at 15), the Court disagrees.

Ms. Salazar now claims bruising of her wrists as well as a dislocated shoulder and shoulder injury, but the only evidence supporting this is her Declaration submitted as Exhibit E to her Response [#36]. Ms. Salazar's Declaration, however, contains self-serving, conclusory statements, unsupported by any documents, medical records, or other admissible evidence to create a material issue of disputed fact. To survive summary judgment, "the nonmovant's affidavit must be based upon personal knowledge and set forth facts that would be admissible in evidence[,]" conclusory and self-serving affidavits are not sufficient. *See* Fed. R. Civ. P. 56(e); *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). This includes affidavits attesting to injuries, which standing alone without corroborating evidence are deemed to be mere conclusory allegations. *See Biron v. Carvajal*, No. 20-cv-2110 (WMW/ECW), 2021 WL 3047520, at *25 (D. Minn. July 20, 2021); *Robinson v. Purcell*, No. 2:14-cv-0790 MCE AC P, 2019 WL 1330874, at *7 (E.D. Cal. March 25, 2019); *Harden v. Roberts*, No. 7:08-CV-63 (HL), 2009 WL 3158172, at *4 (M.D. Ga. Sept. 28 2009) (citing cases). Moreover, the video evidence would appear to contradict Ms. Salazar's claim of a dislocated shoulder, as Ms. Salazar can be seen using both arms and shoulders to lift herself up, off the hospital bed, to allow the x-ray board to be placed under her, without difficulty or complaint of a shoulder injury to medical staff. *Response* [#36], Ex. D at 4:20-4:30.

Based on the foregoing, the Court finds that there are no genuine issues of material fact and that Defendants are entitled to judgment as a matter of law on Ms. Salazar's

excessive force claim based on overly-tight handcuffing.  Summary judgment is thus granted as to Ms. Salazar's excessive force claim.  Because there was no constitutional violation, the Defendant Officers are entitled to qualified immunity on this claim.

### 2.   S.S.

It is well-established that a child may be seized without a warrant when she is in imminent danger, *see Halley v. Huckaby*, 902 F.3d 1136, 1145-46 (10th Cir. 2018), and Plaintiffs do not assert that the brief seizure of S.S. violated the Fourth Amendment.  Their only assertion is that Defendants used excessive force against S.S., specifically, that she was "slammed against the vehicle" in the course of being seized.  *See Compl.* [#1] at ¶ 136.  The Court again finds that Plaintiffs were not "slammed" against the car, as discussed in the previous section, and the push of Plaintiffs towards the car was not violent or forceful.  As the Court already stated in connection with Ms. Salazar, a reasonable jury could not find that Defendants used excessive force in connection with this conduct.  Additionally, while Plaintiffs assert that S.S. injured her ear when she was pushed into the car (Response [#36] at 13), there is no evidence to support that.

Finally, to the extent that Plaintiffs assert that Officer Rodgers used force in taking S.S. from Ms. Salazar's arms, the Court finds that any use of force was minimal.  While Plaintiffs claim that S.S. was "ripped" from her mother's arms (Response [#36] at 1), implying some type of violence, the body-cam videos do not support this.  Instead, the videos show Officer Rodgers took S.S. by the hand and grabbed her body with his other hand to remove her from the situation, as stated in Section I.  Given that S.S. was pinned between her mother and a car, and her mother was about to be handcuffed, the Court

finds that this was reasonable when measured against the perspective of an objectively reasonable officer on the scene. *Graham*, 490 U.S. at 396. The removal of S.S. from Ms. Salazar is also supported by the fact that Defendants had been previously informed that Ms. Salazar was intoxicated and that she had jumped out of the car holding her daughter while both hands were full to pursue a bystander. An objectively reasonable officer could find that removing S.S. from that situation to prevent any harm to her was justified.

Based on the foregoing, the Court finds that summary judgment should be granted as to the excessive force claim as to S.S. Because there was no constitutional violation. the Defendant Officers are entitled to qualified immunity as to this claim as well.

## C.    First Amendment Claim

Ms. Salazar claims that her arrest was in retaliation for the exercise of her First Amendment right not to speak to Officer Quayle and to record her encounter with the Boulder police officers. *See Compl.* [#1] ¶¶ 109-111. To establish a First Amendment retaliation claim, a plaintiff must show that: (1) she was engaged in constitutionally protected activity; (2) the government's actions caused her injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the government's actions were substantially motivated as a response to her constitutionally protected conduct. *Nielander v. Bd. of Cty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009).

Ms. Salazar's claim fails because the existence of probable cause for an arrest defeats her First Amendment retaliation claim. *Mocek v. City of Albuquerque*, 813 F.3d 912, 931 (10th Cir. 2015); *see also Zumwalt v. Evans*, No. 20-cv-01276-KWR-LF, 2021

WL 3051846, at *2 (D.N.M. July 20, 2021).  This goes to the third prong of the First Amendment retaliation claim.   *Mocek*, 813 F.3d at 931.  When there is probable cause for the arrest, as the Court found in Section III.A, *supra,* the third prong requiring that the government's actions were substantially motivated as a response to constitutionally protected conduct cannot be met.   *Id.*   The plaintiff cannot show "'that but for the retaliatory motive, the incidents to which he refers . . . would not have taken place.'" *O'Connor v. Lafayette City Council*, No. 19-cv-01066-WJM-KLM, 2019 WL 8112776, at *7 (D. Colo. Nov. 21, 2019) (quoting *Smith v. Maschner*, 899 F.2d 940, 949-50 (10th Cir. 1990) (internal quotation marks omitted).

Based on the foregoing, the Court finds that summary judgment must also be granted as to this claim.  Again, as Plaintiff has not shown a constitutional violation, and Defendants are entitled to qualified immunity as to this claim.

**D.    Municipal Liability Claim**

The Tenth Circuit has stated that it will not hold a municipality "'liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers.'" *Olson v. Layton Hills Mall*, 312 F.3d 1304, 1317-78 (10th Cir. 2002) (quoting *Hinton v. City of Englewood*, 997 F.2d 774, 782 (10th Cir. 1993)).  This was discussed In *Hinton* in reference to a Supreme Court case, *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  *Hinton*, 997 F.2d at 782.  The *Hinton* court stated:

> In *Heller*, for example, the Supreme Court held that a jury verdict acquitting a Los Angeles police officer of a charge of excessive force precluded the imposition of liability on the City of Los Angeles for adopting a policy condoning the use of excessive force. The Court reasoned that where a municipality is "sued only because [it was] thought legally responsible" for the actions of its officers, it is "inconceivable" to hold the municipality liable

if its officers inflict no constitutional harm, regardless of whether the municipality's policies might have "authorized" such harm.

*Id.* (citing Heller, 475 U.S. at 799).

Here, because Plaintiffs did not establish a constitutional violation by the Defendant Officers, their claim against the City of Boulder "necessarily fails." *Meadows v. City of Oklahoma City*, 851 F. App'x 127, 130 (10th Cir. 2021); *see also Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1150 (10th Cir. 2020).   Accordingly, the municipal liability claim is **dismissed**.

## IV.  Conclusion

Based upon the foregoing,

IT IS HEREBY **ORDERED** that Defendants' Motion for Summary Judgment [#12], seeking summary judgment on the claims against the individual Defendants, is **GRANTED**.

IT IS FURTHER **ORDERED** that as the constitutional claims against the individual Defendants have been dismissed, the municipal liability claim must also be **DISMISSED**.

IT IS FURTHER **ORDERED** that as all claims have been resolved in this Order, the Final Pretrial/Trial Preparation/Jury Instructions Conference set on September 8, 2021 at 1:30 p.m. and the five-day jury trial set to commence on September 20, 2021, are **VACATED**.

IT IS FURTHER **ORDERED** that the Clerk of Court shall terminate this case.

Dated: August 2, 2021

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge